**In the Matter of Michael Francis RICHEY, Debtor.**

**Karen HARPER and Priscilla Armitage, Plaintiffs,**

v.

**Michael F. RICHEY, Defendant.**

**Bankruptcy No. 2–88–00421.
Adv. No. 2–88–0237.**

United States Bankruptcy Court, D. Connecticut.

July 11, 1989.

John P. Zanini, and JoAnn Paul, Beck and Eldergill, Manchester, Conn., for plaintiffs.

Anthony S. Novak, Tarlow, Levy, Harding & Droney, P.C., Farmington, Conn., for debtor-defendant.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUE

In this core proceeding, Karen Harper and Priscilla Armitage, the plaintiffs, allege that a state-court default judgment obtained by them against Michael F. Richey, the debtor, represents a nondischargeable debt. The allegation arises out of transactions in which the plaintiffs invested money in and loaned money to a corporation in which the debtor and his then wife were the sole stockholders. The following facts found are based upon a trial held on April 21, 1989.

### II.

### BACKGROUND

In 1986, the debtor, the owner and operator of a truck used in interstate trucking, decided to incorporate the business. The debtor, who left school after the tenth grade, assumed he did not need the assistance of an attorney and on May 22, 1986, filed a hand-drafted certificate of incorporation for Double Seven Express, Inc. (Double Seven or "the company"). For guidance, he utilized an instruction booklet obtained from the Connecticut Secretary of State's office. Double Seven was incorporated with $1,000.00 stated capital, authorization to issue 5,000 shares of common stock, the debtor elected as president and sole director, and the debtor's wife, Jolene, elected secretary. The debtor claimed at trial to be the owner of 3,000 shares of Double Seven common stock, with Jolene, from whom he is now divorced, the owner of 2,000 shares.

Six months after incorporating the company, the debtor started to contact local banks to secure loans to expand the company's business through improvement of its leased premises and the purchase of more trucks. In January 1987, he was advised to contact the Small Business Administration for assistance, but before any loan applications were acted upon, the debtor met the plaintiff, Karen Harper (Harper).

Among Double Seven's employees was a truck driver named David Bartley (Bartley). Bartley knew that the debtor had been seeking financing for expansion of the company, and he also knew that Harper, a friend of his, was looking to invest some inherited money. Bartley informed Harper that Double Seven needed investors, and he was instrumental in arranging a meeting held on February 27, 1987 between Harper, her husband, the debtor and Bartley.

At the meeting, the debtor explained to the Harpers the nature of the expansion he intended for Double Seven's business. He told them the company was making an annual profit of $15,000.00 with a single truck, and he calculated that the company could make $150,000.00 per year profit if it had ten trucks. The debtor stated that investing in Double Seven would be a good investment, with a potentially high rate of return, and that the Harpers might double their money by year's end. The meeting lasted two and one-half hours during which the debtor showed the Harpers one or two hauling contracts as illustrative of the rates that Double Seven charged customers. The debtor did not produce any com-

pany financial statements. At the conclusion of the meeting, Harper agreed to purchase 1,600 shares of Double Seven common stock for $24,000.00. The debtor advised Harper that Double Seven would have the stock certificates printed and sent to her within thirty days. Harper gave the debtor her check, payable to Double Seven, for $14,000.00 at the meeting and an additional $10,000.00 on March 10, 1987 when the debtor, as company president, issued her a receipt for $24,000.00 for the purchase of the Double Seven stock.

Shortly after the February meeting, the debtor contacted Harper and told her that the company could use an additional $15,000.00 for the purchase of trucks where substantial manufacturer rebates were available. Harper advised the debtor that she did not have any additional money to invest, but that her mother, Priscilla Armitage (Armitage), did. Harper contacted her mother who, without ever visiting the company premises or meeting the debtor, on March 3, 1987, loaned Double Seven $7,000.00 and purchased $8,000.00 worth of stock at $15.00 per share. Mrs. Armitage testified that along with her daughter, she wanted to double her money.

To purchase the trucks, which were to be used, not new, vehicles, the debtor had been dealing with Arthur Ray (Ray), a truck-leasing consultant and broker. Ray and the debtor went around the country, including trips to Ohio, Iowa and Texas, to inspect truck fleets available for sale. The debtor understood that Ray would buy the trucks and lease them to the company. In the end, after months of looking and after the debtor had paid Ray $17,000.00, the truck-leasing program had to be abandoned. Ray provided only one truck, and there were no available manufacturers' rebates. The one truck obtained turned out to need substantial repairs. The debtor contacted a collection agency to regain monies given to Ray, but the agency refused to take the matter.

The debtor had deposited the funds received from the plaintiffs in the Double Seven bank account and used them for company purposes, including the payment of company indebtedness. By June 1987, Harper became concerned that she had neither received stock certificates nor dividend checks, and she demanded a refund of her money. The debtor then first consulted an attorney about Double Seven's financial difficulties and the situation with the Harper and Armitage investments and loan. The attorney advised the debtor that the plaintiffs would be better off with their transactions restructured completely as loans rather than as stock purchases because, if the plaintiffs received stock, they would be holding stock that had no value due to the company's insolvency. The debtor, on June 29, 1987, sent to Harper a letter which stated the following:

At this time, the business appears to be failing because of many complications that were unavoidable and unexpected by us. Our lawyer advised us to file bankruptcy but we do not want to. In the event that we do file, you would be left with nothing.

We are trying to work out an applicable settlement with your investment where you would get your full amount of money invested back plus an interest fee instead of stocks that would cause you to lose everything.

Please be assured that we will not file bankruptcy until all of your money is returned to you. We will contact you immediately once the above is figured out on paper and we will sit down with you at that time to make arrangements and work something out. ·

On July 7, 1987, the plaintiffs brought suit in the Connecticut Superior Court against the debtor and Double Seven alleging fraud, misrepresentation and violation of Connecticut statutes regarding the sale of securities. The state court defaulted the debtor on November 17, 1987 for failure to appear, and entered a judgment for the plaintiffs for $39,000.00 damages plus interest, attorney's fees and court costs. The debtor filed a chapter 13 case on April 22, 1988, which he converted on September 20, 1988 to a case under chapter 7. The plaintiffs filed the present nondischargeability complaint on November 17, 1988, alleging that the state-court's judgment

represented monies obtained by fraud (§ 523(a)(2)(A)); that the fraud or a defalcation occurred while the debtor was acting as a fiduciary (§ 523(a)(4)); and that the debtor's actions amounted to a willful and malicious injury (§ 523(a)(6)).

## III.

### DISCUSSION

■ Section 523(a) of the Bankruptcy Code sets forth exceptions to discharge. The provisions relevant to the present matter are as follows:

§ 523. *Exceptions to discharge.*

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

. . . . .

Exceptions to dischargeability of debts are construed narrowly in favor of the debtor. *In re Danns*, 558 F.2d 114, 116 (2d Cir. 1977). The burden is on the creditor to prove all the facts essential to sustain the objection and, at least in the case of alleged fraud, to do so by clear and convincing evidence. *Family Credit Union v. Schuster (In re Schuster)*, 69 B.R. 352, 355 (Bankr.D.Conn.1987). The plaintiffs do not argue that the state-court default judgment is entitled to collateral estoppel effect in the bankruptcy court on the issue of dischargeability. *Cf. MA & M, Inc. v. Supple (In re Supple)*, 14 B.R. 898, 902 (Bankr. D.Conn.1981).

### A.

### *Section 523(a)(2)(A)*

Under § 523(a)(2)(A), "a debt may be determined nondischargeable based on fraud where the creditor proves that: (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made." *Fugere v. Whitford (In re Whitford)*, 95 B.R. 5, 8 (Bankr. D.R.I.1989). The plaintiff claims the debtor's representations at the February 27, 1987 meeting and on or about March 3, 1987 satisfy this test.

■ Section 523(a)(2)(A) does not cover the debtor's statements, false or not, such as that the plaintiffs could double their money by investing in Double Seven or that Double Seven was a good investment, because that subsection does not apply to statements "respecting the debtor's or an insider's financial condition." Any statement made by the debtor regarding the quality of an investment in Double Seven or the profitability of the company was a statement about an insider's financial condition. *In re Blackwell*, 702 F.2d 490, 492 (4th Cir.1983) (oral representation made by corporation president concerning corporation's financial condition, even if false, outside scope of § 523(a)(2)(A)); *In re Steinburg*, 744 F.2d 1060 (4th Cir.1984) (same— oral representation concerning debtor's financial condition); *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 fn. 1 (Bankr. W.D.Ky.1986) (corporate officer's false representation as to profitability of company made to gain infusion of capital not within § 523(a)(2)(A)); *see* § 101(30). *Contra, Conibear v. Alspach (In re Alspach)*, 76 B.R. 499 (Bankr.E.D.Pa.1987) (company officer's false representation as to financial status of company is type of fraud included under § 523(a)(2)(A)).

■ The plaintiffs claim that the debtor's failure to issue stock to them and his

failure to use their investment for the purchase of additional trucks constitute fraud. It has long been held that, for purposes of nondischargeability, "fraud" means "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong ... and not implied fraud, or fraud in law ...." *Neal v. Clark*, 95 U.S. (5 Otto) 704, 709, 24 L.Ed. 586 (1878); *Ganis Corp. v. Jackson (In re Jackson)*, 89 B.R. 308, 312 (Bankr.D.Mass. 1988). While an intent to deceive may be inferred if the totality of the circumstances merits such an inference, *Ward v. Wyatt (In re Wyatt)*, 87 B.R. 874, 878 (Bankr.E.D. Va.1988); *Fugere v. Whitford (In re Whitford)*, 95 B.R. 5, 8 (Bankr.D.R.I.1989), the plaintiffs have failed to prove the debtor had a dishonest intent with regard to his promises to issue stock certificates and to purchase trucks for the company. I credit the debtor's testimony that events subsequent to the February 27, 1987 meeting, primarily the debtor's misplaced and foolish reliance on Arthur Ray, made it impossible for him to keep his promises as to the trucks. *Cf. Kovitz v. Tesmetges (In re Tesmetges)*, 74 B.R. 911 (Bankr.E.D.N.Y. 1987), *aff'd* 86 B.R. 21 (E.D.N.Y.) *aff'd mem.*, 862 F.2d 304 (2d Cir.1988) (debtor's failure to make promised sale and thereby repay loan not false representation when sale fails due to circumstance beyond debtor's control). As for the stock, the actual issuance of stock from an insolvent company would have been a meaningless act. In addition, nothing in the record establishes that simple steps to increase Double Seven's authorized stock could not have been taken, despite the debtor's apparent ignorance and confusion on the procedure.

■ The plaintiffs further claim that the debtor's violation of Connecticut law regarding the sale of securities constitutes fraud. *See* Conn. Gen. Stat. Ann. §§ 36–470 to 36–502 (Uniform Securities Act) (West 1987 and Supp.1989). The only provisions which apply to the debtor are Conn. Gen. Stat. §§ 36–472 and 36–498.[1] While the debtor may have violated these statutes by his exaggerated opinion as to the financial condition and future of the company when he agreed to sell the company stock, unless such representations were in writing they do not come within the purview of § 523(a)(2). As held in *Bonosky v. Allen (In re Allen)*, 25 B.R. 566, 569–70 (Bankr. S.D. Ohio 1982), a violation of a state statute does not "impute *ipso facto* the necessary elements of a non-dischargeability offense ...."

■ The plaintiffs' concluding argument under § 523(a)(2)(A) is that the debtor's "declarations as to his ability to transfer the stock, as to the value of the corporation and as to the Plaintiffs' potential earnings and dividends, were made with reckless indifference for the truth [and] [s]uch reckless indifference may support a finding of fraud." *Plaintiffs' Brief* 22. Reckless disregard for the truth or falsity of a statement has been held to constitute fraud under § 523(a)(2)(A). *See Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985). The plaintiffs have not met their burden of making that showing as to the ability to transfer the stock, and the remaining statements are not actionable under § 523(a)(2)(A).

## B.

### Section 523(a)(6)

■ The plaintiffs argue that the debtor willfully and maliciously injured them by

---

**1.** *Conn. Gen. Stat. § 36–472.* "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

*Conn. Gen. Stat. § 36–498.* "(a) Any person who: ... (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him ...."

the alleged violation of the Connecticut statutes regarding sale of securities, and their debts are thereby nondischargeable under § 523(a)(6). According to the legislative history, " 'willful' means deliberate or intentional." H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6320. To meet their burden of proof, the plaintiffs must establish that the debtor, without just cause or excuse, intentionally did a wrongful act which necessarily led to injury. *In re Cecchini*, 780 F.2d 1440, 1443 (9th Cir.1986). As evident from the conclusions already reached, *see* § III. A., *supra*, the plaintiffs have failed to prove that the debtor caused willful and malicious injury to them.[2]

### C.

### *Section 523(a)(4)*

■ Plaintiffs' final allegation is that the debtor committed "fraud or defalcation while acting in a fiduciary capacity." § 523(a)(4). "The federal law definition of fiduciary is different from the traditional common law definition and the construction is more restrictive as applied by section 523(a)(4)." *American Sav. & Loan Ass'n. v. Weber (In re Weber)*, 99 B.R. 1001, 19 Bankr. Ct. Dec. (CRR) 205, 209 (Bankr.D. Utah 1989). In order for the plaintiffs to prevail under. § 523(a)(4), the plaintiffs must initially prove that the debtor owed a fiduciary duty to them. It is well settled that § 523(a)(4) applies only to express trusts or trusts created by statute, and not to trusts *ex maleficio*. "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.... The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created." *Davis v. Aetna Acceptance*

*Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). In the present matter, the debtor owed no fiduciary obligation to Harper or to Armitage. At the time of the transactions in question, the debtor was a director, officer and majority shareholder of Double Seven. The plaintiffs have submitted no authority for the proposition that such a person has a fiduciary obligation, within the meaning of § 523(a)(4), to an individual to whom the corporation proposes to sell stock or from whom the corporation borrows money. *Cf. Krug, Inc. v. Nayee (In re Nayee)*, 99 B.R. 90, 92 (Bankr. M.D.Fla.1989).

■ Even if the plaintiffs were correct in their assertion that the debtor, at some point in their relationship, owed them a fiduciary obligation, the record made here provides no basis for the plaintiffs' bald assertion that the debtor converted their funds for his personal benefit. The debtor testified that he spent the plaintiffs' money on corporate purposes and supplied copies of company invoices, cancelled checks and books of account to document this use of the funds. These established facts do not amount to a defalcation in violation of § 523(a)(4).[3]

### IV.

### CONCLUSION

In this proceeding, the court has been presented with plaintiffs who made a disastrous investment decision, unrealistically hoping to double their money in a few months in a nine-month-old company with no track record for that kind of profitability. The plaintiffs have failed to prove that the debtor's actions, despite having resulted in a state-court judgment against him, rendered that judgment nondischargeable. Accordingly, judgment shall enter for the

---

**2.** The parties have not briefed the issue of the standard of proof to be met in a § 523(a)(6) proceeding. Even assuming the standard is one of preponderance of the evidence, the plaintiffs have not proven their § 523(a)(6) allegations.

**3.** The parties have not briefed the issue of the standard of proof to be met in a § 523(a)(4) proceeding. Even assuming the standard is one of preponderance of the evidence, the plaintiffs have not proven their § 523(a)(4) allegations.

debtor that his obligation to the plaintiffs is discharged.