In re Gary Lee
HIGGINBOTHAM, Debtor.

CENTRAL FIDELITY BANK, Plaintiff,

v.

Gary Lee HIGGINBOTHAM, Defendant.

VIRGINIA FIRST SAVINGS BANK
F.S.B., Plaintiff,

v.

Gary Lee HIGGINBOTHAM, Defendant.

Bankruptcy No. 89–01286–RT.
Adv. Nos. 89–0589–RT, 89–0590–RT.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

July 9, 1990.

**212**

Douglas D. Callaway, Central Fidelity Bank, Richmond, Va., for plaintiff, Central Fidelity Bank.

R. Webb Moore, Hirschler, Fleischer, Weinberg, Cox & Allen, P.C., Richmond, Va., for plaintiff, Virginia First Sav. Bank F.S.B.

Peter W. Runkle, Obenshain, Hinnant and Runkle, Richmond, Va., for debtor, defendant.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

Plaintiffs Central Fidelity Bank ("CFB") and Virginia First Savings Bank F.S.B. ("VFSB") filed separate complaints against the debtor to except debts from discharge pursuant to 11 U.S.C. § 523(a). Since the factual patterns relied upon by the plaintiffs were similar, all parties agreed to a consolidated trial which was held on January 16 and 17, 1990. At trial plaintiffs' counsel stated that they were proceeding under §§ 523(a)(2)(A) and (a)(6).

The court's rulings were announced at the conclusion of trial. Judgment orders will be entered in favor of the defendant under § 523(a)(2)(A) and in favor of each plaintiff under § 523(a)(6). This opinion supplements the court's oral ruling.

### Findings of Fact

Debtor Gary Lee Higginbotham filed a chapter 7 bankruptcy petition on June 1, 1989.

Debtor, who had worked in the automobile business since 1979, started Higgie's International Autohaus, Inc. ("Higgie's"), on April 1, 1988, to engage in the sale and financing of automobiles. Debtor was the sole shareholder and president of the corporation. The business was begun on a capitalization of a $10,000.00 loan and $100.00 in capital stock. The $10,000.00 cash had been taken out of the corporation by May 1988. Higgie's was insolvent by October of 1988. Higgie's also filed a chapter 7 petition on June 1, 1989.

In his bankruptcy petition, debtor scheduled an unsecured obligation owed to Higgie's in the amount of $65,000.00. This indebtedness arose from the debtor's practice of withdrawing the corporation's funds for his personal use over and above a salary of $4,500.00 a month. To his credit, the amount of $850.00 was usually withheld from debtor's monthly salary to be applied toward the withdrawals. This debt was not evidenced by any promissory note but was carried on the corporation's books as a noninterest bearing open account.

Higgie's books revealed that during the approximately thirteen months the corporation operated an automobile business, the debtor withdrew or used for his personal benefit the sum of $66,817.00 (exclusive of salary). Of this sum, the amount of $14,963.27 was repaid to the corporation.[1]

Higgie's account receivable of the debtor represented 67 percent of the non-inventory assets of the corporation. The personal withdrawals of cash by the debtor exceeded his gross salary from the corporation. The withdrawals were completely within debtor's discretion and, among other personal uses, were made to pay gambling debts. No significant portion of the withdrawals represented amounts expended by the debtor for business purposes of the corporation.

The debts which are at issue in the two adversary proceedings arose out of two separate loan transactions, one for each plaintiff.

---

**1.** The evidence does not explain the discrepancy between these figures and the $65,000.00 amount reflected in debtor's bankruptcy schedules as the amount he owed Higgie's.

*VFSB Transaction*

On May 23, 1988, Higgie's purchased a 1987 BMW automobile. On May 24, 1988, the corporation and debtor financed this purchase by borrowing the sum of $27,-000.00 from plaintiff VFSB. Loan documents executed in connection with the loan were signed by both Higgie's and debtor individually and provided that the loan was secured by a security interest in the BMW. The debtor understood that the vehicle was to be collateral security for this loan. Under the loan agreement, debtor and Higgie's retained possession of the vehicle and the title to the vehicle; the bank relied upon the borrowers to perfect the bank's security interest by having the lien noted on the vehicle title pursuant to Virginia law. However, the bank's security interest was never noted on the title.

The VFSB loan came due in August 1988 at which time the parties to the transaction agreed to extend the loan to November 22, 1988. On December 1, 1988, a representative of VFSB visited Higgie's premises for the purpose of obtaining a renewal of the loan. The debtor was not present, and the representative discussed the matter with Higgie's bookkeeper. The bank's representative presented the bookkeeper with a new installment loan agreement which had been fully completed with all loan information for the purpose of "rolling over" the original loan. Since the debtor was not then present the bank's representative asked the bookkeeper to have the instrument signed by the debtor and returned to the bank. Subsequently the document was returned to VFSB. As received by the bank the signature of Gary L. Higginbotham had been signed both for Higgie's and individually. However, beside the first signature were the initials, "S.S.". In fact, both signatures had been made by Higgie's bookkeeper with authority from the debtor. This new loan, which effectively paid off the original loan of May 23, 1988, was to be due on March 1, 1989.

2. The evidence is that this transaction was an exchange of vehicles and checks with Higgie's

On December 6, 1988, Higgie's sold the 1987 BMW automobile which was collateral for VFSB's loan for a price of $27,995.00. This price represented the fair market value of the vehicle at the time of sale. The sale proceeds went into Higgie's corporate account but were not used to pay the loan. VFSB's representatives were never advised of the sale of the bank's collateral, and they did not learn of the sale until after debtor and Higgie's filed chapter 7 bankruptcy petitions.

Other than a portion of the loan interest no payments were made on the loan of VFSB. At the time of trial the balance due on the loan was $27,000.00 plus accrued interest, a total in excess of the sale price of the vehicle.

*CFB Transaction*

On January 11, 1989, Higgie's and the debtor as co-owner, executed an installment sales contract for a loan from CFB in the amount of $29,300.00. The agreement stated the loan was to be secured by a 1987 Mercedes 300E automobile. The debtor understood that this vehicle was to stand as collateral security for the loan. By agreement of the parties, Higgie's and the debtor retained possession of the vehicle and the title. However, CFB's security interest was never noted on the vehicle title.

On February 9, 1989, Higgie's and the debtor sold the Mercedes to another automobile dealer for a price of $29,950.00 which sum was received in Higgie's corporate account.[2] No payment from the proceeds was made to CFB, nor was CFB advised of this sale. The balance due on this loan is $23,388.20 plus accrued interest.

With respect to both loans, debtor knowingly (1) failed to have liens noted on the vehicle titles, (2) allowed the banks' collateral to be sold out of trust and (3) retained the funds in his corporation for other uses. In addition, the debtor avoided taking telephone calls from the banks' representative which might have forced him to acknowledge the disposition of collateral.

receiving $2,000.00 more than it expended.

*Discussion And Conclusions*

As stated previously, these two adversary proceedings were consolidated for trial because of factual similarities between the two transactions which are at issue.

▇▇▇ The burden of proof rests with the plaintiffs to establish that their debts are excepted from discharge. In this court the standard of proof applied in § 523(a) proceedings is by a preponderance of the evidence. *See Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988); *Seery v. Basham (In re Basham),* 106 B.R. 453 (Bankr. E.D.Va.1989).[3]

The evidence here reveals that the debtor and his wholly owned corporation while engaged in a used automobile business sold two vehicles which were collateral security for loans from the plaintiffs; instead of using the sale proceeds to repay the loans, the funds were retained by the corporate operator of the business, Higgie's. In the automobile sales business, a dealer's sale of automobile collateral without paying the secured lender is known as selling "out of trust".

The debtor operated Higgie's for approximately 13 months, and during this time he withdrew cash from the corporation as needed for personal use. In fact the evidence establishes that the debtor withdrew more in irregular personal cash withdrawals from the corporation than he did in salary.

The plaintiffs ask the court to except their loans from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).

*Section 523(a)(2)(A).*

▇▇▇ A determination of nondischargeability under § 523(a)(2)(A) requires a finding by the court that the debtor obtained money or credit by false pretenses, false representations or actual fraud. The plaintiff must establish the following elements:

(1) That the debtor made misrepresentations or committed other fraud,

(2) That at the time the debtor knew the conduct was fraudulent,

(3) That the debtor's conduct was with the intention and purpose of deceiving or defrauding the creditor,

(4) That the creditor relied on the debtor's representations or other fraud and

(5) That the creditor sustained loss and damage as the proximate result of the representations or fraud.

*See Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967); *In re Basham,* 106 B.R. at 457.

In many cases the most difficult element of fraud to establish is that the debtor intended to defraud the creditor at the time of obtaining money or credit. Direct evidence of a fraudulent intent at the inception of a transaction may be hard to come by, and this element must often be proven inferentially by the circumstances of the transaction. *See Ward v. Wyatt (In re Wyatt),* 87 B.R. 874, 878 (Bankr.E.D.Va. 1988).

▇▇▇ Here, the court must conclude that the plaintiffs have not proven the debtor had the requisite fraudulent intent at the time the loans were made or renewed. Therefore, the plaintiffs cannot prevail under the fraud exception of § 523(a)(2)(A).

*Section 523(a)(6).*

This section excepts from discharge a debt arising because of the debtor's willful and malicious injury to an entity or to the property of an entity. The use of the term entity rather than person broadens the scope of the exception. *See* 11 U.S.C. § 101(14) (1988) (definition of entity), and 11 U.S.C. § 101(35) (1988) (definition of person).

▇▇▇ The term willful is defined as " 'deliberate or intentional', a deliberate and intentional act which necessarily leads to injury." *Rountrey v. Lee (In re Lee),* 90 B.R. 202, 207 (Bankr.E.D.Va.1988). As to malice, the Court of Appeals for the Fourth

---

**3.** The Supreme Court recently granted certiorari in a case involving the appropriate standard of proof in fraud dischargeability cases under 11 U.S.C. § 523(a)(2). *See Henson v. Garner (In re Garner),* 881 F.2d 579 (8th Cir.1989), *cert. granted, Grogan v. Garner,* —— U.S. ——, 110 S.Ct. 1945, 109 L.Ed.2d 308 (1990).

Circuit in *St. Paul Fire & Marine Ins. Co. v. Vaughn* wrote:

> there is no need to show specific malice under § 523(a)(6) of the Code on the part of the debtor. Something implied is no less true than something expressed. Only the method of proof is different. Implied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6).

*St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1010 (4th Cir.1985). *See In re Lee,* 90 B.R. at 207.

It is clear that this exception to discharge applies to liabilities resulting from conversions of property. However, as with fraud, the creditor seeking to use this exception may have a difficult burden to establish the debtor's actions were both willful and malicious.

■ Nevertheless the court concludes in this proceeding that the debtor's conduct resulting in his failure to pay the plaintiffs' secured loans was willful and malicious, and therefore the loans will be excepted from discharge under § 523(a)(6). Debtor's conduct was unquestionably willful; he acknowledged that he knew his actions were in contravention to the loan agreements with the banks. The principal issue here concerns malice. Since the debtor testified that he intended ultimately to pay the loans, the court has relied upon the circumstances, i.e., the evidence of debtor's knowledge and conduct, to find the requisite malice.

The Court of Appeals for the Eighth Circuit addressed the issue of whether the breach of a security agreement by a company president who also personally guaranteed the underlying loan was sufficient to except the resulting debt from discharge pursuant to § 523(a)(6) in *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875 (8th Cir.1985). The court in *Long* found that the circumstances of the case precluded a finding of malice. This conclusion was based largely upon the debtor's "purported purpose of saving the business and preventing losses to all credi-

tors." *Long,* 774 F.2d at 882. Additionally, and more importantly for the court's analysis here, the *Long* court also looked to the fact that the debtor had kept all of the money in the corporation. A total of just $38.00 had been diverted from the company, which the court found to be *"de minimis* considering the magnitude of the claim." *Long,* 774 F.2d at 882. Finally, the court commented that:

> [D]ebtors who willfully break security agreements are testing the outer bounds of their fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge.

*Long,* 774 F.2d at 882.

The facts in the present case are clearly distinguishable from the facts of *Long.* Here, the debtor diverted large amounts of money for his personal use, which under the reasoning of *Long* justifies an exception from discharge for those debts.

In *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (11th Cir.1987), the Eleventh Circuit Court of Appeals held that an individual debtor who is "an officer of a corporation, [who] actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to said party and thus the debt is nondischargeable pursuant to section 523(a)(6)." *Owens,* 807 F.2d at 1559.

This court also notes that a decision against the debtor is not contrary to the Supreme Court's holding in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), upon which the debtor relied. The Court in *Davis* refused to except from discharge an automobile dealer's debts arising from the sale of inventory out of trust. The Supreme Court concluded:

> [A] wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have

been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one.

.    .    .    .    .

The discharge will prevail as against a showing of conversion *without aggravated features*.

*Davis*, 293 U.S. at 332–33, 55 S.Ct. at 153 (citations omitted) (emphasis added).

In concert with the *Davis* holding and in contrast to its facts, the circumstances under which the debts arose in this proceeding justify a finding of malicious injury. Debtor knew the automobiles were to be collateral for the bank loans and that he had an obligation to protect the collateral. Nevertheless, without perfecting the liens on title, he sold both vehicles, failed to advise the banks of his disposition of their collateral, and retained the funds for other uses.[4] Moreover, there is evidence of his successful efforts to avoid the banks' representatives when they telephoned him about the loans.

Finally, the evidence of debtor's free use of corporate funds for personal purposes at a time when the debtor knew the corporation was in serious financial condition reinforces the court's conclusion that the debtor acted both willfully and maliciously. Accordingly, the "aggravated features" present in this case justify the court's holding that both debts arising from the sales out of trust are excepted from discharge pursuant to § 523(a)(6).

*Amounts Excepted From Discharge, § 523(a)(6).*

The plaintiffs assert, and the court agrees, that the amounts to be excepted from discharge under § 523(a)(6) are the lesser of the balances owed on the loans and the values of the collateral at the time of debtor's disposition of the collateral. The amounts thus excepted from discharge are as follows:

Central Fidelity Bank        $23,388.20 (plus accrued interest)

Virginia First Savings Bank   $27,995.00

Separate orders will be entered.

---

**4.** There was evidence at trial which indicated that it is not customary in the retail automobile business for the dealer to routinely record the secured lender's lien on title. Perhaps so. But custom cannot excuse a borrower's sale out of trust to the lender's detriment when there has been a failure to comply with the underlying security agreement.